## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Thomas Daniel Rhodes,                              Civ. No. 17-4025 (JNE/BRT)

              Petitioner,

v.                                                 **REPORT AND**
                                                   **RECOMMENDATION**
Michelle Smith, Warden,

              Respondent.

Mark R. Bradford, Esq., Bassford Remele, P.A.; Samuel T. Lockner, Esq., and Alexandra J. Olson, Esq., Carlson, Caspers, Vandenburgh, Lindquist, & Schuman, P.A.; and Julie A. Jonas, Esq., The Innocence Project of Minnesota, counsel for Petitioner.

Matthew Frank, Esq., Assistant Attorney General, counsel for Respondent.

BECKY R. THORSON, United States Magistrate Judge.

       Petitioner Thomas Daniel Rhodes seeks relief pursuant to a successive petition for

a writ of habeas corpus under 28 U.S.C. § 2254. In 1998, a jury found Petitioner guilty of

first-degree murder for the death of his wife, who drowned in Green Lake in Spicer,

Minnesota. (Doc. No. 1, Habeas Pet. 2–6.) Since that time, Petitioner has pursued

numerous postconviction actions in state and federal court, described in more detail

below.[1]

---

[1]       *See, e.g.*, *Rhodes v. State*, 875 N.W.2d 779 (Minn. 2016) (*Rhodes IV*) (Third and Fourth State Court Postconviction Petitions); *Rhodes v. State*, 735 N.W.2d 315 (Minn. 2007) (*Rhodes III*) (Second State Court Postconviction Petition); *State v. Rhodes*, 657 N.W.2d 823 (Minn. 2003) (*Rhodes II*) (First State Court Postconviction Petition); *State v. Rhodes*, 627 N.W.2d 74 (Minn. 2001) (*Rhodes I*) (Direct Appeal); *Rhodes v. Dingle*,

(Footnote Continued on Next Page)

Petitioner filed this Petition on August 29, 2017. He claims that constitutional errors occurred at his trial based on later-developed advances in scientific understanding about internal neck hemorrhages in drowning victims, in addition to the discovery of new evidence regarding the water temperature in Green Lake. This new evidence, according to Petitioner, demonstrates that his conviction was the product of false testimony, and as a result, violated his federally-protected rights to due process and under the Confrontation Clause. (Habeas Pet. 22–33.) Petitioner filed this Petition after the Eighth Circuit granted his request for authorization to file a successive habeas petition in district court. (Doc. No. 2-1, Decl. of Mark R. Bradford ("Bradford Decl.") ¶ 2, Ex. 1); *see* 28 U.S.C. § 2244(b)(3)(C). Petitioner urges the Court to grant him a new trial or, at minimum, an evidentiary hearing. (Habeas Pet. 1–2, 37.) Respondent argues that the Petition should be denied because Petitioner failed to meet the requirements for relief on a second or successive petition. (Doc. No. 7, Resp't's Mem. of Law in Supp. of Answer ("Resp't's Mem.") 25–34.)

On February 26, 2018, Respondent filed the underlying trial transcript. (Doc. No. 17, Trial Transcript ("Tr.").) The Court held a hearing on the Petition on March 21, 2018. (Doc. No. 19.)

_____

(Footnote Continued from Previous Page)
Civil No. 08-198 (RHK/SRN), 2008 WL 482362 (D. Minn. Feb. 19, 2008) (Second Federal Habeas Petition); *Rhodes v. Fabian*, No. Civ. 04-176 (RHK/SRN), 2005 WL 2704896 (D. Minn. Sept. 12, 2005) (First Federal Habeas Petition). The instant Petition can be labeled Petitioner's Third Federal Habeas Petition.

In this matter, this Court considers its gatekeeping role for Petitioner's successive petition under the requirements set forth in the Antiterrorism and Effective Death Penalty Act ("AEDPA"). *See* 28 U.S.C. § 2244(b)(1), (2). To succeed on this successive Petition, Petitioner must meet the following requirements:

> (b)(1) A claim presented in a second or successive habeas corpus application under section 2254 that was presented in a prior application shall be dismissed.

> (2) A claim presented in a second or successive habeas corpus application under section 2254 that was not presented in a prior application shall be dismissed unless—

>> (A) the applicant shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

>> (B)(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and

>> (ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2244(b). This Court recommends that the Petition be denied because Petitioner cannot satisfy the requirement that the facts underlying his claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found him guilty. *Id.* § 2244(b)(2)(B)(ii).

3

I.    **Background**

    A.    **Petitioner's State Court Conviction for First-Degree Premeditated Murder**

On the evening of August 2, 1996, Petitioner and his wife Jane were vacationing with their two sons at the Northern Inn near Spicer, Minnesota. *Rhodes I*, 627 N.W.2d at 77. At around 11:30 p.m., Petitioner and his wife drove their 1995 Baja Blast, a 14-foot water-jet-type-boat, onto Green Lake. *Rhodes II*, 657 N.W.2d at 828. At some point, Jane went overboard into the water. *Id.* She was not wearing a life jacket and was not a good swimmer. *Id.* Thirteen hours later, Jane's body was discovered by a fisherman about nine-tenths of a mile northwest of the last-seen point identified by Petitioner. *Id.* The cause of her death was drowning. *Rhodes IV*, 875 N.W.2d at 781.

At trial, the State argued that Petitioner forced his wife overboard with a blow to the neck, struck her with the boat multiple times, and subsequently lied to police about the location of her drowning. *Id.* Dr. Michael McGee was the State's medical expert. He testified at the trial that, in his opinion, the internal neck injuries were caused by force, without leaving external signs of trauma.

    Q.    Doctor, let's begin with your examination of the inside of Mrs. Rhodes' neck.

    A.    Okay.

    Q.    Was anything found that was forensically significant during that examination?

    A.    Yes.

    Q.    Could you please describe that to the jury?

A.    Mrs. Rhodes has a series of soft tissue hemorrhages inside her neck region. On a case when an autopsy is done on a forensic setting, the neck is examined with care. Hemorrhage can be observed underneath the soft tissues at the base of Mrs. Rhodes' neck on both sides, overlying thick bands of muscles. . . .

. . . .

Q.    Now, do you have an opinion as to how that internal injury can be caused - -

A.    Yes.

Q.    - - while leaving no external marks on the skin?

A.    Yes.

Q.    And what is that opinion?

A.    I believe the subject received some type of trauma to the outer surface of the skin in the neck area and in this area, with enough force to cause breakage of the blood vessels in these focal areas here, here and here, to cause the blood vessels to rupture and cause the hemorrhage to occur for a period of time prior to the subject's death.

Q.    How long would that force have had to have been applied?

A.    Well, it's going to have to be applied long enough to break the blood vessels in the area, although we have seen cases in our office where trauma has been applied to the neck region. It doesn't take trauma applied for a prolonged period of time to cause the blood vessels to break, since they are in an area where the tissue is rather soft.

Q.    Now, you described the trauma having to be applied in several focal areas, including if I can describe it, underneath, what, Mrs. Rhodes chin?

A.    True.

Q.    Yes. Could that have been done with a hand, in particular a hand used thus in the V position?

A.    I believe that is possible, yes.

5

(Tr. 638, 640–41.)

Jane Rhodes' body resurfaced after 13 hours and the parties disputed whether Petitioner was truthful about the location of the incident. Experts at trial disagreed about the drowning location and when the victim's body could have been expected to resurface given the lake conditions. *Rhodes IV*, 875 N.W.2d at 781. Captain William Chandler testified for the prosecution. Specifically, he testified that it would take longer than 13 hours for a body to resurface in the area described by Petitioner.

> Q.     Now, Captain, generally, what is the relationship in a Minnesota lake between the depth of the water and the temperature of the water?
>
> A.     In Minnesota lakes, upper Midwest, they are all fresh water lakes that are over 30 feet deep, you've got some basic levels of water in all of them, but starting about 30 feet on down, the bottom temperature of any Minnesota lake year round is about 39 degrees, so it's essentially like a refrigerator.
>
> . . . .
>
> Q.     Now, Captain, if the water was – you are saying that at the bottom it's 39.2 degrees, and I understand you can't give an absolute depth to that. But if the water was five feet deep, it's not going to be 39 degrees at the bottom; is it?
>
> A.     No, it won't.
>
> Q.     And what about ten or 15 feet deep?
>
> A.     No, it still won't.
>
> Q.     How deep does the water have to get in Minnesota before that bottom layer is going to generally be at that 39.2 degree level?
>
> A.     Outside of Lake Superior, generally it's going to take 30 feet or more.

Q.  Captain, if Jane Rhodes' body had sunk in Minnesota lake water approximately 40 feet deep, do you have an opinion as to how long it would have taken her to refloat?

A.  Yes, I do.

Q.  What is that opinion?

A.  It would be, minimally, several weeks. Three to four weeks.

Q.  What are the reasons for that opinion, Captain?

A.  The biggest reason is the temperature. It's like the bottom of a lake is colder than what – how we compare it, is colder than a medical examiner's refrigerator, and it's going to preserve a person that's down there, and take considerable time on its own to refloat.

(Tr. 1117, 1119–20.) Defense expert Dale Morry testified that water temperature varies from lake to lake depending on the depth of the lake, the size of the lake, and the above-surface temperature, but "as a 'rule of thumb' a person who drowned in 40 feet of water would resurface in five to eight days." *Rhodes IV*, 875 N.W.2d at 781–82.

On July 29, 1998, the jury found Petitioner guilty of first-degree premeditated murder, and he was sentenced to mandatory life imprisonment. *Rhodes IV*, 875 N.W.2d at 781.

**B.  Petitioner's Attempts to Obtain Postconviction Relief in State and Federal Court**

**1.  Direct Appeal and First State Court Postconviction Petition**

Petitioner filed a direct appeal, which was stayed so he could pursue a postconviction petition. *Rhodes I*, 627 N.W.2d at 81. In his First State Court Postconviction Petition, Petitioner asserted that his trial counsel was ineffective for failing to adequately cross-examine Dr. McGee and to present available medical evidence

to counter his testimony. *See Rhodes II*; *see also Rhodes IV*, 875 N.W.2d at 782.

Petitioner also asserted a newly-discovered-evidence claim consisting of recent medical

articles related to drowning forensics. *Id.* Petitioner's challenge included an affidavit

from Dr. John Plunket, a forensic pathologist, who opined that the internal hemorrhaging

in the victim's neck probably occurred "during the process of drowning and the struggle

for survival." *Id.* In *Rhodes I*, the Minnesota Supreme Court consolidated Petitioner's

direct and postconviction appeals, rejected Petitioner's evidentiary challenges, stayed the

consolidated appeal, and remanded to the postconviction court for an evidentiary hearing

to determine whether trial counsel's performance was objectively reasonable. 627

N.W.2d at 85–86, 88–89.

At the evidentiary hearing, Dr. Ronald Wright testified that the hemorrhaging in

the victim's neck could have been caused by some kind of pressure to the throat but,

equally as likely, could have been caused during the drowning process. *Rhodes IV*, 875

N.W.2d at 782. Dr. McGee reaffirmed his trial testimony that the victim's injuries were

caused by external pressure on the neck and being struck by a boat. *Id.* Dr. Plunket and

Dr. Lindsey Thomas testified that based on their review of recent medical articles, they

believed the hemorrhaging in the victim's neck during the drowning process or

postmortem was a result of hypostasis or a breaking of rigor mortis. *Id.* After receiving

this evidence, the postconviction court denied Petitioner's request for postconviction

relief, concluding that the trial counsel's performance was not objectively unreasonable

and that the alleged newly discovered medical evidence did not warrant a new trial. *Id.*;

*see also Rhodes II*, 657 N.W.2d at 839.

8

### 2. The Minnesota Supreme Court Finds Sufficient Evidence to Support Petitioner's Conviction

In *Rhodes II*, the Minnesota Supreme Court held that the evidence presented at trial was sufficient to support Petitioner's conviction. 657 N.W.2d at 829–32, 839–42. The evidence included witnesses who saw a boat zigzagging and heard yelling from its occupants; inconsistencies in Petitioner's statements; physical evidence that the victim's body could not have sunk at the location marked by Petitioner and resurfaced in 13 hours; the discovery of the victim's body nine-tenths of a mile from the location marked by Petitioner; motive evidence including life insurance proceeds, household debt, and Petitioner's extramarital affair; and medical testimony that the victim's head injuries were consistent with multiple strikes by a boat and her neck injuries were caused by external pressure. *Rhodes IV*, 875 N.W.2d at 782. The Minnesota Supreme Court also concluded that the performance by Petitioner's trial counsel was not objectively unreasonable. *Rhodes II*, 657 N.W.2d at 843. Regarding the new medical literature, the Minnesota Supreme Court held that even if it "present[ed] ground-breaking research," Petitioner failed to show that it would "probably produce an acquittal or a result more favorable to him on retrial." *Id.* at 846; *see also Rhodes IV*, 875 N.W.2d at 783 (explaining that Petitioner failed to meet the fourth prong of the newly-discovered-evidence test set forth in *Rainer v. State*, 566 N.W.2d 692 (Minn. 1997)). The Minnesota Supreme Court explained:

> This allegedly newly available medical evidence does not diminish the circumstantial evidence heard and considered by the jury. There was sufficient evidence *independent of the medical evidence*, including physical and motive evidence, testimony as to Rhodes' conduct, and inconsistencies

9

in Rhodes' statements, to conclude that [the victim's] death was a premeditated homicide . . . . Rhodes has not established . . . that [this evidence] would probably produce an acquittal or a result more favorable to him on retrial.

*Rhodes II*, 657 N.W.2d at 846 (emphasis added).

### 3.    The Minnesota Supreme Court Affirms the Denial of Petitioner's Second State Court Postconviction Petition

On December 1, 2006, three years after his direct appeal was final, Petitioner filed his Second State Court Postconviction Petition. *See Rhodes III*, 735 N.W.2d 315 (Minn. 2007). Petitioner alleged that he was entitled to a new trial based on newly discovered evidence of lake conditions that purportedly explained why his wife's body was found almost nine-tenths of a mile from where he told searchers he had last seen her. *See id.* The postconviction court summarily denied the Second State Court Postconviction Petition, and the Minnesota Supreme Court affirmed. *Id.* at 319. The Minnesota Supreme Court explained that Petitioner "had not shown that the information about the 'uneven bottom' of the lake was not available to him or his counsel during his trial or that his failure to learn of it before trial was not due to a lack of diligence." *Id.*

### 4.    The Minnesota Supreme Court Affirms the Denial of Petitioner's Third State Court Postconviction Petition

On November 27, 2012, Petitioner filed his Third State Court Postconviction Petition. *Rhodes IV*, 875 N.W.2d at 783. This petition alleged newly-discovered evidence gathered by a private investigator and submitted to Petitioner in a report from 2009 and 2010. *Id.* at 783–84. The report contained maps of Green Lake and GPS/Sonar Data; general descriptions of the effects of carbon monoxide poisoning; witness statements

regarding the manner in which Petitioner returned to shore after his wife fell in the lake; and witness statements regarding the victim's head injuries. *Id.* at 784. The postconviction court summarily denied the third petition as untimely, and in the alternative, concluded that the claims failed on their merits. *Id.* The Minnesota Supreme Court stayed the appeal to allow Petitioner to file another postconviction petition, Petitioner's fourth in state court. *Id.* In a consolidated appeal, the Minnesota Supreme Court affirmed the denial of the Third State Court Postconviction Petition as untimely. *Id.* at 787.

### 5.    Petitioner's Fourth State Court Postconviction Petition Alleging the New Evidence at Issue in this Case

Petitioner filed his Fourth State Court Postconviction Petition on March 21, 2014, alleging that he was entitled to relief based on two types of newly-discovered evidence. *Rhodes IV*, 875 N.W.2d at 784–86.

### a.    Scientific Literature on Drowning Forensics

Petitioner alleged a newly-discovered evidence claim based primarily on scientific literature addressing drowning forensics and reports from experts applying that literature to this case. *Id.* at 784. This literature addresses the causes of injuries and bodily changes in drowning cases, including neck hemorrhaging, portmortem lividity (gravity-dependent pooling of blood), body buoyancy, travel abrasions (injuries caused by scraping the lake bed or shore), and animal predation. *Id.* Petitioner relied most heavily on two articles: Pollanen (2009) and Alexander & Jentzen (2011), which allegedly establish changed scientific knowledge on the causes of neck hemorrhaging in drowning cases. *Id.* Pollanen

11

(2009), for example, concluded that when a dead body is angled downwards (a "head down position"), hemorrhagic lividity of the soft tissue of the neck (extravascular rupture and leakage of blood vessels due to gravitational pressure after death) may occur, causing "pseudo bruises" that may lead to "misidentification of violent neck injury." *Id.* Alexander & Jentzen (2011), a case study of a single drowned body, concluded that hemorrhaging in the anterior neck muscles can be explained by elevated venous pressure and the rupture of congested blood vessels caused by reactions during drowning, such as coughing, gagging, vomiting, and abdominal contractions. *Id.* at 784–85. In an affidavit, Dr. Jentzen asserted that the Alexander & Jentzen study (which he co-authored) disproved the scientific community's earlier belief that hemorrhages in the anterior neck muscles "do not occur in drowning and should always raise the suspicion of foul play." *Id.* at 785. After reviewing Dr. McGee's autopsy report, Dr. Jentzen opined that "the hemorrhage in [the victim's] neck *could* have occurred during the drowning process or postmortem, as opposed to pre-mortem external pressure." *Id.* (emphasis in original).

Addressing Pollanen (2009), Alexander & Jentzen (2011), and the expert affidavits submitted by Petitioner, Dr. McGee signed an affidavit stating that he still believed "the opinions and conclusions in the testimony [he] provided at trial and postconviction evidentiary hearing were correct as related to the death of [the victim]." *Id.* Dr. McGee asserted that, unlike the hemorrhaging in the victim's neck, the hemorrhaging described in the Alexander & Jentzen study was "confined to the fascial surfaces of the muscle." *Id.* Moreover, Dr. McGee asserted that Petitioner's experts had

12

looked at each of his findings "in isolation and misinterpreted both the nature and cause of each finding." *Id.*

### b.    Lake Temperature

Petitioner also alleged a false-testimony claim based on a lake survey report conducted by the Minnesota Department of Natural Resources ("DNR"). *Rhodes IV*, 875 N.W.2d at 785. This DNR report allegedly establishes that the State's witness, Captain Chandler, testified incorrectly at trial regarding the temperature of Green Lake on the night of the drowning. *Id.* According to the DNR report, the temperature of Green Lake in August 1996, at a depth of 40 feet, was 68.9 degrees, whereas Captain Chandler testified that the lake temperature at that depth was 39 degrees. *Id.* This evidence was offered to undermine the State's theory that the body could not have resurfaced in 13 hours due to the water temperature. *See id.*

### 6.    The Minnesota Supreme Court Affirms the Denial of Petitioner's Fourth State Court Postconviction Petition in *Rhodes IV* Because the Newly-Discovered Evidence Did Not Establish his Innocence by a Clear and Convincing Standard

The Minnesota Supreme Court's analysis turned on whether Petitioner's fourth postconviction petition satisfied the "newly-discovered-evidence" exception to the applicable statute of limitations. *Rhodes IV*, 875 N.W.2d 787–91; Minn. Stat. § 590.01, subd. 4(b)(2). Under this standard, Petitioner was required to allege newly-discovered evidence that "establishes by a clear and convincing standard that the petitioner is innocent of the offense or offenses for which the petitioner was convicted." *Rhodes IV*, 875 N.W.2d at 788 (internal citations omitted). Such evidence "must be unequivocal,

intrinsically probable, and free from frailties." *Id.* This standard is "more stringent than the newly-discovered-evidence test that applies to timely petitions," which the Minnesota Supreme Court applied "in rejecting Rhodes's similar claim of newly-discovered evidence in *Rhodes II*, 657 N.W.2d at 845–46. The innocence prong that we apply here requires more than mere 'uncertainty' about a petitioner's guilt." *Id.*

First, regarding the newly-discovered evidence on drowning forensics, the Minnesota Supreme Court explained that Dr. McGee did not testify that neck hemorrhages never occur naturally during the drowning process. *Id.* Instead, Dr. McGee testified that he believed the victim "received some type of trauma to the outer surface of the skin in the neck area . . . with enough force to cause breakage of blood vessels," and that it was "possible" that the external neck trauma[2] could have "been done with a hand, in particular a hand used . . . in the V position." *Id.* at 788–89. Further, Dr. Jentzen, after reviewing Dr. McGee's autopsy report, did not opine that the victim's neck injuries *were caused* by the drowning process. *Id.* at 789. Instead, he opined that "the hemorrhage in [the victim's] neck *could* have occurred during the drowning process or postmortem, as opposed to pre-mortem external pressure." *Id.* (emphasis in original). And Dr. Rao, another expert hired by Petitioner, stated: "Recent scientific literature supports my

---

[2]    To be clear, while the Minnesota Supreme Court in *Rhodes IV* uses the phrase "external neck trauma," Dr. McGee testified that the victim's neck was "clear" of "any marks on the outside of Mrs. Rhodes' neck that would correspond to these internal injuries." (Tr. 639.) Thus, as explained in Petitioner's brief, Dr. McGee's testimony is "based on the premise that a person can violently choke or strike a person in the neck with enough compressive force 'to cause breakage of the blood vessels,' while leaving no external signs of trauma (such as bruising)." (Habeas Pet. 7.)

14

conclusion that the hemorrhages in [the victim's] neck *could be* attributable to something other than external pressure." *Id.* (emphasis in original). Thus, the equivocal nature of Petitioner's theory led the Minnesota Supreme Court to conclude that even if proven, it would not establish Petitioner's innocence by clear and convincing evidence. *Id.* "Put differently, that the victim's internal neck hemorrhages 'could' have been caused by natural drowning processes does not unequivocally establish that Rhodes did not kill his wife." *Id.*

Moreover, the Minnesota Supreme Court found that even if the scientific evidence fully refuted Dr. McGee's testimony, it would not establish Petitioner's innocence because the murder conviction is "independently supported by nonmedical (i.e., nonscientific) evidence." *Id.* This includes "physical and motive evidence, testimony as to Rhodes' conduct, and inconsistencies in Rhodes' statements." *Id.* at 790 (citing *Rhodes II*, 657 N.W.2d at 846. In *Rhodes II*, the Court summarized this evidence as follows:

> First, given that Jane's body was found less than 13 hours after she went into Green Lake, she could not have fallen into the lake where Rhodes said she did because the depth of the water there was 40 feet and physical evidence proves that, under the circumstances, a body under 40 feet of water would not refloat for three to four weeks. Furthermore, Jane could not have fallen into the lake where Rhodes said she did because, given the wind speed and direction, her body could not have moved nine-tenths of a mile to the location where it was found the next day. The jury could have reasonably rejected Rhodes' explanation that he was confused and disoriented in giving directions to law enforcement officials at the time of the accident and believed the state's theory that Rhodes lied to the officials about the correct location to search.
>
> Second, the inference that Rhodes killed his wife by causing her to fall into the lake and then running over her is supported by testimony from shore witnesses. Rhodes' defense that he was zigzagging, looking for Jane, or that witnesses must have seen a different boat driving erratically at the time in

question could have been reasonably rejected by the jury because numerous witnesses testified they saw only one boat on the lake at that time, that the boat was a jet boat like Rhodes', that the boat was the same color as Rhodes' boat, and that it was driving in fast figure eights and nines for about 20 minutes. Furthermore, one witness heard a male and female voice coming from the boat; one heard a woman scream, 'Stop. No. It hurts.'; and two heard a woman's screams. One witness saw a boat with two people in it and then later saw just a man wearing a light-colored shirt, as did Rhodes . . . .

Additional support for the jury's verdict came from motive evidence, including evidence of a relationship Rhodes had with another woman, evidence that Rhodes had met with an attorney about a divorce and that Rhodes learned of his child support obligation, evidence that the family household debt nearly doubled between November of 1995 and July 1996, evidence that the amount for which Jane's life was insured increased from $102,000 to $233,000 in the four months preceding her death, and evidence that Rhodes applied for an additional $50,000 in life insurance for Jane a week before she died.

Finally, the jury could have found Rhodes' accounts of what happened out on the lake implausible or inconsistent. It does not seem likely to us that if Rhodes had been looking for his wife in the water and trying to rescue her he would have driven in fast, erratic patterns for 15 to 20 minutes. Furthermore, Rhodes told differing accounts—that he was driving slowly when she fell out and that he was driving almost at top speed, that there were no other boats on the lake at the time Jane fell in and that there was another boat but it did not respond to Rhodes' flashing lights, that Jane fell over the back of the boat and fell over the side, that he heard a muffled scream and that Jane did not scream, and that Rhodes immediately went back to where he thought Jane had fallen in and that he missed the throttle on the first grab but then turned the boat and headed back.

657 N.W.2d at 840–42.[3] In *Rhodes IV*, the Minnesota Supreme Court explained that its

"legal determinations in *Rhodes II* apply with equal force here." 875 N.W.2d at 790.

---

[3]    Regarding the medical evidence, the Court in *Rhodes II* reasoned that it "also supports the jury's verdict. Dr. McGee testified that injuries to Jane's face occurred while she was alive and could not have been caused by a single blow but could have been caused by multiple strikes from the hull of a boat. Dr. McGee also testified that the hull

(Footnote Continued on Next Page)

Similarly, the Minnesota Supreme Court found that the new evidence about Green Lake water temperatures was insufficient to establish Petitioner's innocence by clear and convincing evidence. *Rhodes IV*, 875 N.W.2d at 791. Even if Captain Chandler had provided incorrect testimony on water temperatures and a three-to-four week resurfacing time, the jury still heard testimony from a defense expert (Dale Morry) that a drowned body at a 40-foot depth takes at least five days to resurface. *Id.* The Minnesota Supreme Court noted that in a post-trial affidavit, Captain Chandler indicated that in light of the 68.9-degree temperature in the DNR report, it still would have taken approximately one week for the body to resurface from a 40-foot depth. *Id.* And Petitioner did not offer evidence that defense expert Morry changed his opinion on a five-day minimum resurfacing period based on the warmer temperatures in the DNR report. *Id.* Therefore, the Minnesota Supreme Court concluded the State's theory that Petitioner lied about the drowning location—that he saw the victim fall overboard at a 40-foot depth—would remain unaffected because there is no evidence that a 13-hour resurfacing time is possible from that depth, regardless of the water temperature. *Id.*[4]

---

(Footnote Continued from Previous Page)
of a boat could not have caused the damage to her neck but that a hand in the 'V' position could have caused it." 657 N.W.2d at 841.

[4]    In a dissent written by Justice G. Barry Anderson and joined by Justice David L. Lillehaug, Justice Anderson maintained that Petitioner "alleged the existence of evidence that, if true and considered in the light most favorable to the petition, would establish by a clear and convincing standard that no reasonable jury would have convicted Rhodes had the newly discovered evidence been presented at trial." 875 N.W.2d at 792 (Anderson, J., dissenting). The dissent emphasized that the case against Petitioner was "wholly circumstantial," in which case an evidentiary hearing is "particularly important" to

(Footnote Continued on Next Page)

### 7.    First and Second Federal Habeas Petitions

Petitioner has previously filed two federal petitions for relief under 28 U.S.C. § 2254. *See Rhodes v. Fabian*, 2005 WL 2704896; *Rhodes v. Dingle*, 2008 WL 482362.

Petitioner filed his First Federal Habeas Petition on January 26, 2004. (*Rhodes v. Fabian*, Case No. Civ. 04-176 (RHK/SRN), Doc. No. 1.) He argued that the State failed to prove all elements of its case against him beyond a reasonable doubt in violation of due process; trial counsel was ineffective for failing to object to certain questions the prosecutor asked of the State's medical expert; trial counsel's decision not to investigate certain matters prior to trial constituted ineffective assistance of counsel; and the denial of Petitioner's request for a new trial violated his federally protected right to due process because newly-discovered evidence establishes his innocence. 2005 WL 2704896, at *2, 8. Petitioner's newly-discovered evidence included the testimony of a guest at the hotel where Petitioner was staying on the night his wife drowned, along with "a substantial amount of new forensic medical testimony" that "relied in part on newly published scientific articles in support of new opinions that Jane Rhodes' neck injuries occurred post-mortem." *Id.* at *6. On April 25, 2005, Magistrate Judge Nelson issued a Report and Recommendation that the petition be denied, which was adopted in an order by Judge Kyle on September 12, 2005. *See id.* Regarding the newly-discovered evidence claim, the

_____

(Footnote Continued from Previous Page)
determine if the innocence prong of Minn. Stat. 590.01, subd. 4(b) has been satisfied. *Id.* In the dissent's view of the State's "[e]ntirely circumstantial case," Dr. McGee's testimony that external force caused the victim's neck hemorrhaging "was the most critically incriminating evidence of the entire trial." *Id.* at 793.

Court reasoned that Petitioner did not establish a constitutional violation in the state criminal proceedings, so his "claim of actual innocence, which is dubious at best based on the post-conviction evidence, thus is not cognizable." *Id.* at *8 (internal citation omitted).

Petitioner filed his Second Federal Habeas Petition on January 22, 2008. (*Rhodes v. Dingle*, Case No. Civ. 08-198 (RHK/SRN), Doc. No. 1.) On January 24, 2008, Magistrate Judge Nelson issued a Report and Recommendation that the petition be dismissed for lack of jurisdiction because Petitioner failed to obtain advance authorization from the court of appeals to file a second or successive petition. 2008 WL 482362, at *3. Judge Kyle issued an order adopting the Report and Recommendation on February 19, 2008. *Id.*

## II.    Legal Analysis of Petitioner's Successive Petition

### A.    Petitioner's Third Federal Habeas Petition is a Successive Petition

Petitioner filed this Third Federal Habeas Petition on August 29, 2017. In this successive Petition, Petitioner argues that he is entitled to a new trial or, at minimum, an evidentiary hearing because his conviction is the result of false testimony concerning the scientific understanding about internal neck hemorrhages in drowning victims, and concerning the temperature of Green Lake when his wife drowned. (Habeas Pet. 1–2, 20–37.) Respondent argues that Petitioner cannot meet the requirements for relief on a second or successive petition. (Resp't's Mem. 25–34.)

### B.    Standards Governing Second or Successive Petitions

The filing of a second or successive § 2254 Petition is "tightly constrained by the provisions of AEDPA." *Case v. Hatch*, 731 F.3d 1015, 1026 (10th Cir. 2013) (cited with approval by the Eighth Circuit in *Johnson v. United States*, 720 F.3d 720, 720–21 (8th Cir. 2013)). In enacting AEDPA, Congress "expressly established a two-step 'gate-keeping' mechanism for the consideration of second or successive habeas corpus applications in federal courts." *Id.* Petitioners must first "move in the appropriate court of appeals for an order authorizing the district court to consider the application." 28 U.S.C. § 2244(b)(3)(A). The court of appeals then has 30 days to decide whether to grant the authorization to file. *Id.* § 2244(b)(3)(D).

If the court of appeals finds that the applicant has made "a prima facie showing that the application satisfies the requirements of [§ 2244(b)]," *id.* § 2244(b)(3)(C), the habeas petitioner may pursue a claim in district court. *See Case*, 731 F.3d at 1026–27. Then, the district court must "review the proffered evidence, and 'shall dismiss any claim . . . that the court of appeals has authorized to be filed unless the applicant shows that the claim satisfies the requirements of [§ 2244(b)]." *Id.* at 1027 (quoting 28 U.S.C. § 2244(b)(4)).

As explained in *Case*, these two "gates" are "jurisdictional in nature, and must be considered prior to the merits of a § 2254 petition." *Id.*; *see also Goldblum v. Klem*, 510 F.3d 204, 217 (3d Cir. 2017) ("We have made it clear that unless both the procedural and substantive requirements of § 2244 are met, the District Court lacks authority to consider the merits of the petition."). Section 2244(b) provides that a "successive habeas corpus

20

application 'shall be dismissed' unless the gate-keeping requirements are met and clearly speaks to the power of the court to entertain the application, rather than any procedural obligation of the parties." *Case*, 731 F.3d at 1027. In addition, "one purpose of AEDPA is to enforce Congress's preference for a state's interest in finality of judgment over a prisoner's interest in additional review." *Id.* Thus, this Court must determine whether Petitioner satisfies the requirements of § 2244(b), and the Court's "review owes no deference to the rulings of the state courts." *Id.*

### 1.  First Gate—28 U.S.C. § 2244(b)(3)

Petitioner stepped through the first gate by moving "in the appropriate court of appeals for an order authorizing the district court to consider the application," 28 U.S.C. § 2244(b)(3)(A), and receiving authorization from the Eighth Circuit to file this action. (*See* Bradford Decl. ¶ 2, Ex. 1.) Although the order contains no reasoning or explanation, the Eighth Circuit's authorization means that Petitioner has made a "prima facie showing that the application satisfies the requirements of" section 2244. *See* 28 U.S.C. § 2244(b)(3)(C). This is "not a difficult standard to meet." *In re Lott*, 366 F.3d 431, 432 (6th Cir. 2004). "Prima facie in this context means simply sufficient allegations of fact together with some documentation that would warrant a fuller exploration in the district court." *Id.* at 433; *see also Bennett v. United States*, 119 F.3d 468, 469 (7th Cir. 1997) ("If in light of the documents submitted with the application it appears reasonably likely that the application satisfies the stringent requirements for the filing of a second or successive petition, we shall grant the application.").

## 2.    Second Gate—28 U.S.C. §§ 2244(b)(1), (2)

When analyzing whether Petitioner can pass through the second gate, this Court "must not defer" to the Eighth Circuit's "preliminary determination" at the first gate. *Case*, 731 F.3d at 1029. The Eighth Circuit was "merely making an initial gate-keeping ruling," and this Court is "still required to determine, at the second gate, whether [Petitioner has] met § 2244's jurisdictional requirements." *Id.* "If either the district court, or [the court of appeals]—reviewing the district court's determination de novo—finds that [the petition] fails at this second gate, his petition will be dismissed." *Id.*; *see also In re Morris*, 328 F.3d 739, 741 (5th Cir. 2003) (explaining that authorization is "tentative in the following sense: the district court must dismiss the motion that we have allowed the applicant to file, without reaching the merits of the motion, if the court finds that the movant has not satisfied the requirements for the filing of such a motion"); *Bennett*, 119 F.3d at 470 ("The movant must get through two gates before the merits of the motion can be considered.").

As previously referenced, the jurisdictional requirements to pass through the second gate are as follows:

(b)(1) A claim presented in a second or successive habeas corpus application under section 2254 that was presented in a prior application shall be dismissed.

(2) A claim presented in a second or successive habeas corpus application under section 2254 that was not presented in a prior application shall be dismissed unless—

(A) the applicant shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

22

(B)(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and

(ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2244(b).

Therefore, Petitioner must show that the claims in this Petition were not presented in a previous federal petition, 28 U.S.C. §§ 2244(b)(1), (2); that the "factual predicate for the claim[s] could not have been discovered previously through the exercise of due diligence," *id.* § 2244(b)(2)(B)(i); and that "the facts underlying the claim[s], if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." *Id.* § 2244(b)(2)(B)(ii); *see also Case*, 731 F.3d at 1030–44. The district court is directed to "dismiss any claim presented in a second or successive application that the court of appeals has authorized to be filed unless the applicant shows that the claim satisfies the requirements of this section." 28 U.S.C. § 2244(b)(4).[5]

---

[5]    Petitioner's claims do not rely on "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable." 28 U.S.C. § 2244(b)(2)(A).

### 3. 28 U.S.C. §§ 2244(b)(1), (2)—Same or Different Claims

Respondent argues that Petitioner's claim pertaining to drowning forensics was presented in his First Federal Habeas Petition.[6] The standard for "distinguishing repetitious claims from new ones is the substantial similarity rule used to determine whether a claim has been exhausted in state court." *Gimenez v. Ochoa*, 821 F.3d 1136, 1141 (9th Cir. 2016). Under the exhaustion test, a petitioner can introduce additional facts to support a claim on federal habeas review so long as he presented the "substance" of the claim to the state courts. *Id.* (citing *Vasquez v. Hillery*, 474 U.S. 254, 257–58 (1986)). Dismissal for failure to exhaust "is not required when evidence presented for the first time in a habeas proceeding *supplements*, but does not *fundamentally alter*, the claim presented to the state courts." *Morris v. Dretke*, 379 F.3d 199, 204 (5th Cir. 2004) (citing *Vasquez*, 474 U.S. at 262) (emphasis in original); *see also Ward v. Norris*, 577 F.3d 925, 935 (8th Cir. 2009) ("The federal claim cannot contain significant additional facts such that the claim was not fairly presented to the state court, but closely related claims containing an arguable factual commonality may be reviewed."). Therefore, Petitioner's claim is not barred under § 2244(b)(1) if it contains significant additional facts that fundamentally alter the claim that was previously presented.

Petitioner's claim of newly-discovered scientific evidence is based primarily on Pollanen (2009) and Alexander & Jentzen (2011), which were both published after Petitioner's First Federal Habeas Petition was filed in 2004. These articles, according to

---

[6]    Respondent does not argue that Petitioner's lake temperature claim was presented in a previous Federal Habeas Petition.

24

Petitioner, refute the previously-accepted science that internal neck hemorrhages cannot

occur as a result of natural drowning. To be sure, Petitioner pursued a similar strategy in

his first § 2254 petition, citing "newly published scientific articles in support of new

opinions that Jane Rhodes' neck injuries occurred post-mortem." 2005 WL 2704896, at

*6; *Rhodes II*, 657 N.W.2d at 846 & n.10 (discussing the post-conviction medical

evidence). Petitioner contends that the science presents significant new facts. The

Alexander & Jentzen study, for example, established that neck hemorrhaging can occur

*before* death as the person struggles to stay above water. (Bradford Decl. ¶ 6, Ex. 5,

Alexander & Jentzen (2011), *Neck and Scleral Hemorrhage in Drowning*.) Moreover,

Alexander & Jentzen noted that the accepted science in 2006—two years after

Petitioner's First Federal Habeas Action was filed in 2004—was that "scleral

hemorrhages and hemorrhage in the anterior neck muscles which are often seen in cases

of strangulation do not occur in drowning and should always raise the suspicion of foul

play." Alexander & Jentzen at 524 (quoting Spitz, DJ, *Investigation of Bodies in Water*,

Spitz & Fisher's Medicolegal Investigation of Death (4th ed. 2006)). Therefore, for

purposes of this analysis, this Court will presume that the newly-dated articles transform

the claim into a new one.[7]

---

[7]    This Court assumes, for purposes of this Petition, that the scientific evidence cited
by Petitioner is new. However, there are notations from Petitioner's own experts
suggesting that the science is not altogether new. (*See, e.g.*, Doc. No. 2-2, Bradford Decl.
¶ 11, Ex. 10, Forensic Report of Dr. Carl Wigren ("Wigren Report") at 6 ("Another study
found intramuscular hemorrhages in more than half of drowning cases. (Puschel, 1999).
The authors conclude that such hemorrhages can be 'attributed to agonal convulsions,
hypercontraction and overexertion of the affected muscle groups,' thought to occur during
(Footnote Continued on Next Page)

### 4.    28 U.S.C. § 2244(b)(2)(B)(i)—Due Diligence

To satisfy § 2244(b)(2)(B)(i), the factual predicate for Petitioner's claims must not have been discoverable previously through the exercise of due diligence. *Engesser v. Dooley*, 686 F.3d 928, 937 (8th Cir. 2012). "This prong means that an applicant seeking permission to file a second or successive habeas motion must show some good reason why he or she was unable to discover the facts supporting the motion before filing the first habeas motion." *In re Boshears*, 110 F.3d 1538, 1540 (11th Cir. 1997); *see also* Brian R. Means, Fed. Habeas Manual § 11.28 (May 2017).

Pollanen (2009) and Alexander & Jentzen (2011) were published after Petitioner's First Federal Habeas Action was filed in 2004. Therefore, this Court finds that Petitioner had good reason for not discovering this information when his first petition was filed—even though, as noted above, the science may not be characterized as entirely "new." (*See, e.g.*, Wigren Report 6 (citing 1999 study on intramuscular hemorrhages)).

The data from the DNR Report, by contrast, may have been publicly available in 1997. (*See* Doc. No. 8-4, Affidavit of William F. Klumpp ("Klumpp Aff.") ¶ 5 ("The data in the lake survey reports, including temperature data, are public. The 1996 report would first have been available in 1997.").) Petitioner fails to supply any good reason why this

---

(Footnote Continued from Previous Page)
drowning."); *see id.*, Ex. 11, Affidavit of Dr. Ronald K. Wright ("Wright Aff.") ¶ 7 ("There is new scientific literature that supports my conclusion that the hemorrhages in Jane Rhodes's neck were postmortem . . . . While I was aware of the phenomenon described in these articles prior to their publication, before these publications there was more room for disagreement about the interpretation of neck hemorrhages in drowning victims.").) This Court assumes for purposes of its analysis, however, that the literature cited by Petitioner is new.

information was not discovered before filing his First Federal Habeas Petition in 2004.

Therefore, it does not appear that Petitioner acted with diligence with respect to the lake

temperature claim, but Petitioner denies that the Report was available. (Habeas Pet. 21.)

While the water temperature evidence could likely have been discovered previously with

diligence, this Court will assume for purposes of the analysis that diligence is established.

### 5.    28 U.S.C. § 2244(b)(2)(B)(ii)—Constitutional Error

Under this provision, Petitioner must show that the "facts underlying the claim, if

proven and viewed in light of the evidence as a whole, would be sufficient to establish by

clear and convincing evidence that, but for constitutional error, no reasonable factfinder

would have found the applicant guilty of the underlying offense." 28 U.S.C.

§ 2244(b)(2)(B)(ii). This standard has been described as a "strict form of innocence . . .

roughly equivalent to the Supreme Court's definition of innocence or manifest

miscarriage of justice in *Sawyer v. Whitley*, 505 U.S. 333 (1992)." *Case*, 731 F.3d at

1031; *Johnson v. Dretke*, 442 F.3d 901, 911 (5th Cir. 2006); *Ross v. Berghuis*, 417 F.3d

552, 557 n.4 (6th Cir. 2005) ("This section adopts *Sawyer*'s strenuous requirement of

'clear and convincing evidence' of actual innocence, rather than *Schlup*'s[8] required

showing that it is 'more likely than not' that a jury would not convict the petitioner.").

### a.    "But for Constitutional Error"

At the second gate, Petitioner is "required to tie his newly proffered facts to the

claimed constitutional violation." *Case*, 731 F.3d at 1032. This is "not a merits inquiry.

---

[8]    *See Schlup v. Delo*, 513 U.S. 298 (1995).

That inquiry is reserved for *after* the applicant has passed through the second gate. Instead, the applicant must show a linkage between the alleged constitutional error and the new facts of innocence." *Id.* (emphasis in original). Courts have held that it would be "placing the metaphorical cart before the horse to require that the petitioner demonstrate a constitutional violation, when that inquiry is reserved for a determination on the merits." *Id.* (collecting cases). This Court's review at this stage is de novo. "We review the gate-keeping analysis de novo, but when we reach the merits, we will apply the deferential standards of § 2254 in determining whether an actual constitutional violation occurred. To require a full showing at this stage would collapse the § 2254 inquiry into § 2244, making § 2244 redundant." *Id.*

Petitioner claims that his conviction is based on false evidence: Dr. McGee's expert opinion testimony that the victim's neck hemorrhages were caused by external compression, such as a hand in the "V" position, and Captain Chandler's expert opinion testimony about the temperature of Green Lake. Petitioner therefore argues that his conviction violates his federally-protected rights to due process and under the Confrontation Clause.

The use of false evidence to obtain a conviction violates due process. *See Winslow v. Smith*, 696 F.3d 716, 735 (8th Cir. 2012). "There is no doubt that, if the government knows that false evidence is being used to obtain a conviction or is being presented, the trial cannot in any real sense be termed fair." *Honken v. United States*, 42 F. Supp. 3d 937, 1013 (N.D. Iowa 2013) (citing *Napue v. Illinois*, 360 U.S. 264, 269 (1959)). Petitioner argues that this general principle should be extended to scientific evidence that

is later undermined or proven to be false. He offers three cases in support of his due process claim: *Lee v. Glunt*, 667 F.3d 397 (3d Cir. 2012) ("*Lee I*"), *Lee v. Houtzdale SCI*, 798 F.3d 159 (3d Cir. 2015) ("*Lee II*"), and *Gimenez v. Ochoa*, 821 F.3d 1136 (9th Cir. 2016).

Regarding the second alleged violation, the Confrontation Clause gives a criminal defendant the right to cross-examine witnesses against him. *United States v. Drapeau*, 414 F.3d 869, 875 (8th Cir. 2005) (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 678–79 (1986)). Petitioner argues that he was denied the right to "effective" cross-examination because he was not allowed to cross-examine Dr. McGee and Captain Chandler about newly-discovered evidence that impeaches their testimony. *See Delaware v. Fensterer*, 474 U.S. 15, 20 (1985).

Therefore, Petitioner has sufficiently identified two possible constitutional violations. Next, the Court "must determine whether the newly discovered evidence, based on the record as a whole, would lead every reasonable juror to a conclusion of 'not guilty.'" *Case*, 731 F.3d at 1032. Before reaching that inquiry, however, "an initial consideration is the universe of evidence [courts] can consider in evaluating the claim." *Id.*

### b.    "Evidence as a Whole"

The "universe of evidence" to be considered in connection with 28 U.S.C. § 2244(b)(2)(B)(ii) is limited to "the evidence presented at trial, properly adjusted for evidence [Petitioner] alleges was erroneously excluded *due to trial-related constitutional error*." *Case*, 731 F.3d at 1033 (emphasis in original). This analysis proceeds in three

steps: (1) start with the body of evidence produced at trial, (2) add "evidence allegedly kept from the jury due to an alleged [constitutional] violation," *Sawyer*, 505 U.S. at 349, and (3) determine whether it is "clear and convincing," "in light of the evidence as a whole," that "no reasonable factfinder would have" convicted Petitioner. *Id.* at 1038. This universe "consists *only* of evidence presented at the time of trial, adjusted for evidence that would have been admitted or excluded 'but for constitutional error' during trial proceedings." *Id.* at 1038 (emphasis in original). The "factual universe does not encompass new facts that became available only after trial and that are not rooted in constitutional errors occurring during trial." *Id.*

Accordingly, this Court is limited to reviewing the evidence presented at trial, plus the new evidence that is tied to Petitioner's allegations of constitutional error. The latter includes newly-discovered scientific evidence related to internal neck hemorrhages in drowning victims and the water temperature in Green Lake. No other evidence can be considered.[9]

---

[9]    Thus, for example, any newly-submitted opinion evidence unrelated to the science regarding internal neck hemorrhages is not relevant to this Court's analysis. (*See, e.g.*, Doc. No. 2-1, Bradford Decl. ¶ 7, Ex. 6, Affidavit of Bryce Hyma ("Hyma Aff.") ¶ 5 ("Other injuries to the face and head appear to be postmortem. The injuries to the mouth appear to be typical aquatic animal activity. The hemorrhages in the eyes appear to be artifact injuries from floating face down for up to 13 hours."); Bradford Decl. ¶ 8, Ex. 7, Affidavit of Valerie Rao ("Rao Aff.") ¶¶ 6–7 ("Abrasions on Jane Rhodes's face and hands were typical postmortem injuries commonly seen in drowning victims . . . . The laceration in the corner of Jane Rhodes's mouth was most likely caused by aquatic animals feeding as she floated in the water for nearly 13 hours."); Bradford Decl. 9, Ex. 8, Affidavit of Dr. Jeffrey Jentzen ("Jentzen Aff.") ¶ 9 ("I believe the laceration on the corner of Jane Rhodes's mouth also occurred postmortem. It does not appear consistent with a 'stretch injury,' as posited by Dr. McGee. It could have been caused by

(Footnote Continued on Next Page)

### c.     "Clear and Convincing Evidence"

Adding the evidence allegedly kept from the jury due to the alleged constitutional violations—newly-discovered scientific evidence related to internal neck hemorrhages in drowning victims and the water temperature in Green Lake—to the "body of evidence produced at trial," this Court must determine whether it is "clear and convincing," "in light of the evidence as a whole," that "no reasonable factfinder would have found" Petitioner guilty of murdering his wife. *Case*, 731 F.3d at 1039.

### i.     Scientific Literature on Drowning Forensics

Petitioner argues that the scientific consensus about drowning forensics has evolved to disprove the notion that internal neck hemorrhages always raise the suspicion of foul play. *See* Pollanen (2009); Alexander & Jentzen (2011). Petitioner offers opinions from a series of expert pathologists from across the country: Dr. Bruce Hyma, Chief Medical Examiner for Miami-Dade County, Florida; Dr. Valerie Rao, Chief Medical Examiner for Duval County, Florida; Dr. Jeffrey Jentzen, Professor of Pathology at the University of Michigan and co-author of the Alexander & Jentzen study; Dr. Victor Weedn, Chair of the Department of Forensic Sciences at George Washington University; Dr. Judy Melinek, a Harvard-educated pathologist from San Francisco, California; Dr. Ronald Wright, a forensic pathologist and former professor at the University of Miami; and Dr. Carl Wigren, a forensic pathologist from Seattle, Washington. (*See*

---

(Footnote Continued from Previous Page)
aquatic animals feeding as she floated in the water or by catching the lip on something in the water.").

Bradford Decl. ¶¶ 7–13, Exs. 6–12.) These experts disagree with Dr. McGee's conclusion that the internal hemorrhages were caused by external pressure. (*See, e.g.*, Hyma Aff. ¶ 6 ("The hemorrhages in the neck do not appear to have been caused by external pressure. Neck hemorrhages can occur during the drowning process and floating face down can cause blood to accumulate in neck tissues.") (citing Pollanen and Alexander & Jentzen); Rao Aff. ¶ 9 ("Recent scientific literature supports my conclusion that the hemorrhages in Jane Rhodes' neck could be attributable to something other than external pressure.") (citing Pollanen and Alexander & Jentzen); Jentzen Aff. ¶ 10 ("In my opinion, the hemorrhages in Mrs. Rhodes' neck could have occurred during the drowning process or post-mortem, as opposed to pre-mortem external pressure.").)

But the notion that internal neck hemorrhages do not *always* raise the suspicion of foul play does not mean that internal neck hemorrhages *never* raise the suspicion of foul play. As the Minnesota Supreme Court observed in *Rhodes IV*, two of Petitioner's experts—Drs. Jentzen and Rao—testified only that the hemorrhaging *could* have been caused by something other than external pressure. 875 N.W.2d at 789; (*see* Jentzen Aff. ¶ 10 ("In my opinion, the hemorrhages in Mrs. Rhodes' neck could have occurred during the drowning process or postmortem, as opposed to pre-mortem external pressure."); Rao Aff. ¶ 8 ("While neck hemorrhages can be caused by antemortem external pressure, other phenomena could explain the hemorrhages in this case, such as improper postmortem handling of the body or lividity.")). Petitioner's other experts were similarly equivocal. (*See, e.g.*, Hyma Aff. ¶ 6 ("Neck hemorrhages *can* occur during the drowning process and floating face down.") (emphasis added); Weedn Report 3 ("I do not agree that the

intramuscular hemorrhage is *specific to trauma*. This finding *can be somewhat subjective, but I also believe that some intramuscular hemorrhage can be due to lividity*.") (emphasis added); Wigren Report 7 ("The hemorrhage surrounding the hyoid bone is *likely* explained by either a perimortem mechanism . . . and/or postmortem hypostatic hemorrhage.") (emphasis added).)[10] Thus, Petitioner's experts implicitly concede the possibility that foul play could have caused the internal neck hemorrhaging. Moreover, the State's expert, Dr. McGee, still believes that "the opinions and conclusions in the testimony [he] provided at the trial and postconviction evidentiary hearing were correct as it relates to the death of Jane Rhodes." (Doc. No. 8-5, Affidavit of Dr. Michael McGee ("McGee Aff.") ¶ 13); *see also Rhodes IV*, 875 N.W.2d at 785. Dr. McGee explained that, unlike the hemorrhaging in the victim's neck, the hemorrhaging described in the Alexander & Jentzen study was "confined to the fascial surfaces of the muscle" and "there was congestion of the thyroid gland but no report of any hemorrhage in the hyoid bone or other neck organs." (McGee Aff. ¶ 23.) Further, the subjects in Pollanen were "elderly people with chronic disease," and the study noted it was "unexplained" that "'hypostatic hemorrhages could not be induced in all cadavers, despite the ability to concentrate the liver mortis in the neck and even form Tardieu spots,'" which indicates

---

[10]     *See also* Wright Aff. ¶ 7 ("There is new scientific literature that supports my conclusion the hemorrhages in Jane Rhodes' neck were postmortem . . . . While I was aware of the phenomena described in these articles prior to their publication, before these publications there was *more room* for disagreement about the interpretation of neck hemorrhages in drowning victims.") (emphasis added); Melinek Report 2 ("There is nothing definitive or even alarming in the traumatic injuries to Mrs. Rhodes['] body that would *exclusively rule in* homicidal injury.") (emphasis added).

that "'post mortem prone positioning and advancing post mortem interval is necessary but perhaps not sufficient to create hypostatic hemorrhages.'" (McGee Aff. ¶¶ 24–25 (quoting Pollanen).)

Petitioner emphasizes the dissent's statement in *Rhodes IV* that Dr. McGee's testimony about the victim's neck hemorrhaging being caused by external force was "the most critically incriminating evidence of the entire trial." 875 N.W.2d at 793. Petitioner's newly-proffered expert opinion testimony, however, does not invalidate the basis for Dr. McGee's testimony that the victim's neck hemorrhages were caused by foul play. Petitioner's evidence, if proven and considered in light of all the other evidence (including Dr. McGee's testimony), would not be sufficient to establish by clear and convincing evidence that no reasonable juror would have found Petitioner guilty.

Additionally, there was other evidence, aside from the medical expert opinion testimony, that supports Petitioner's guilty verdict. *See Rhodes IV*, 875 N.W.2d at 790 (citing *Rhodes II*, 657 N.W.2d at 846). This includes testimony from shore witnesses that undermined Petitioner's defense that he was zigzagging, looking for his wife, or that witnesses must have seen another boat, *Rhodes II*, 657 N.W.2d at 841 ("numerous witnesses testified they saw only one boat on the lake at that time, that the boat was a jet boat like Rhodes', that the boat was the same color as Rhodes' boat and with lights like the lights on Rhodes' boat, and that it was driving in fast figure eights and nines for about twenty minutes"); testimony from one witness who "heard a male and female voice coming from the boat; one heard a woman scream, 'Stop. No. It hurts.'; and two heard a woman's screams," *id.*; one witness who "saw a boat with two people in it and then later

saw just a man wearing a light-colored shirt, as did Rhodes," *id.*; evidence that Petitioner had a relationship with another woman, met with an attorney about a divorce, and learned about his potential child support obligations in the event of a divorce, *id.*; evidence that the family household debt nearly doubled between November of 1995 and July 1996, *id.*; and evidence that Jane Rhodes' life insurance increased from $102,000 to $233,000 in the four months preceding her death, and Petitioner applied for an additional $50,000 in life insurance for his wife a week before she died. *Id.*[11]

Therefore, even if there were no basis for the jury to determine that the neck hemorrhages were caused by external force (as opined by Dr. McGee), and instead, the evidence proved that the neck hemorrhages were caused by the natural drowning process (as maintained by Petitioner's experts), the evidence is not "clear and convincing" that "no reasonable factfinder" could have found Petitioner guilty. 28 U.S.C. § 2244(b)(2)(B)(ii). Put another way, Petitioner's expert testimony does not prove that Petitioner is innocent and did not murder his wife. For example, Petitioner still could have forced his wife into the water in such a way that did not result in physical injuries to her neck and then struck her with the boat, leaving her to drown. It is undisputed that the victim's cause of death was drowning, and the autopsy further revealed a subgaleal hematoma on the undersurface of the frontal area of the scalp, which is consistent with

---

[11]    It also includes evidence that Petitioner lied about where his wife allegedly fell into the water because of where and how quickly her body resurfaced. *Rhodes II*, 657 N.W.2d at 840. As discussed below, Captain Chandler's testimony about the temperature of Green Lake, based on his understanding of Minnesota lake temperatures generally, does not undermine the thrust of his opinion that the body resurfaced too quickly, suggesting that Petitioner lied about where his wife allegedly fell into the water.

the State's theory that Petitioner struck the victim with the boat upon entering the water. (*See* McGee Aff. ¶ 14; *see also* Weedn Report 3; Wigren Report 8–9; Rao Aff. ¶ 5 ("The galeal and subgaleal injury occurred around the time of Jane Rhodes's death. It was consistent with impact against a broad, flat surface, such as the hull of a boat or any other blunt object.").) As the Minnesota Supreme Court explained in *Rhodes II*, it "does not seem likely . . . that if Rhodes had been looking for his wife in the water and trying to rescue her he would have driven in fast, erratic patterns for 15 to 20 minutes." 657 N.W.2d at 841.

The cases cited by Petitioner—*Lee I*, *Lee II*, and *Gimenez*—highlight his inability to satisfy the demanding clear and convincing standard set forth in § 2244(b)(2)(B)(ii). The petitioner in *Lee I* and *Lee II* was convicted of first-degree murder and arson after his daughter died in a cabin fire. *Lee I*, 667 F.3d at 400. He argued that newly-discovered evidence proved that fire expert testimony used to secure his convictions was fundamentally unreliable and therefore his continued incarceration violated due process. *Id.* The petitioner averred that "his expert will conclude that there is no support for the conclusion that the fire was intentionally set if he is given the opportunity to analyze the fire scene evidence and apply the principles known through the new developments in fire science to that physical evidence." *Id.* at 407. The Third Circuit found that these allegations, if proven, "set forth a *prima facie* case for granting Lee habeas relief on his due process claim by showing that the admission of the Commonwealth's fire expert testimony undermined the fundamental fairness of Lee's entire trial because the

36

testimony was premised on unreliable science and was therefore itself unreliable." *Id.*[12] The court remanded the case for discovery and an evidentiary hearing. *Id.* at 407–08. On remand, the district court granted habeas relief, and the Third Circuit affirmed. *Lee II*, 798 F.3d at 169. The Commonwealth conceded that "due to scientific developments since Lee's trial in 1990, the basis for all of this [fire science] evidence is now invalid." *Id.* at 167. Without this invalid evidence, the remaining evidence at trial was insufficient to show that the petitioner was guilty beyond a reasonable doubt. *Id.* at 169.[13]

In *Lee*, the scientific advancement rendered the trial testimony invalid. Here, the new evidence does not render Dr. McGee's opinion invalid because the new scientific literature still does not foreclose the possibility of foul play in this case.

Petitioner cites *Gimenez* for the proposition that "habeas petitioners can allege a constitutional violation from the introduction of flawed expert testimony at trial if they show that the introduction of this evidence 'undermined the fundamental fairness of the entire trial.'" 821 F.3d at 1145 (quoting *Lee II*, 798 F.3d at 162); (*see* Habeas Pet. 26.)[14] In *Gimenez*, the petitioner presented affidavits from new experts to argue that the

---

[12]    *See also Lee I*, 667 F.3d at 403 ("To succeed, Lee must show that the admission of the fire expert testimony 'undermined the fundamental fairness of the entire trial,' because 'the probative value of [the fire expert] evidence, though relevant, is greatly outweighed by the prejudice to the accused from its admission.'") (internal citations omitted).

[13]    The petition in *Lee* was an initial petition, not a second or successive petition.

[14]    The court observed in *Gimenez* that due process violations from the introduction of false testimony had previously been found only where a fact witness "told lies (even unknowingly so) or the prosecution relied on phony documents." 821 F.3d at 1142–43.

prosecution's experts offered false testimony. *Id.* at 1142. The court observed that any

contradictions in expert testimony amounted to "a difference of opinion—not false

testimony." *Id.* The petitioner had presented "a battle between experts who have different

opinions about how [the victim] died." *Id.* at 1143. Gimenez was not entitled to relief

because he "presented literature revealing not so much a repudiation of triad-only SBS,

but a vigorous debate about its validity within the scientific community" that "continues

to the present day." *Id.* at 1145. Ultimately, the court held that the petitioner could not

prove by "'clear and convincing evidence' that 'no reasonable factfinder' would have

found him guilty but for the introduction of purportedly flawed SBS testimony." *Id.*

(quoting 28 U.S.C. § 2244(b)(2)(B)(ii)).

Petitioner's experts do not agree with Dr. McGee, but as stated in *Gimenez*,

"[i]ntroducing expert testimony that is contradicted by other experts, whether at trial or at

a later date, doesn't amount to suborning perjury or falsifying documents; it's standard

litigation." *Id.* at 1143. Petitioner's scientific evidence on drowning forensics is not clear

and convincing evidence of his innocence.

### ii.    Lake Temperature

Regarding the lake temperature, Captain Chandler testified that the temperature of

Green Lake was 39 degrees at a depth of 40 feet, but according to the DNR Report, the

temperature at that depth was actually 68.9 degrees. Even if Captain Chandler's

testimony about the temperature of Green Lake was wrong, the thrust of his testimony—

that the body resurfaced too quickly—is not undermined by the newly-discovered

evidence. The "State's theory that Rhodes lied about the drowning location—that he saw

the victim fall overboard at a 40-foot depth—would remain unaffected because there is no evidence that a 13-hour resurfacing time is possible from that depth, regardless of the water temperature." *Rhodes IV*, 875 N.W.2d at 791. Moreover, defense expert Dale Morry testified that water temperature varies from lake to lake depending on the depth of the lake, the size of the lake, and the above-surface temperature, but "as a 'rule of thumb' a person who drowned in 40 feet of water would resurface in five to eight days." *Rhodes IV*, 875 N.W.2d at 781–82. The defense witness testimony at trial was not inconsistent with the State's theory.[15]

### iii.    Drowning Forensics Plus Lake Temperature

In sum, the evidence tied to the alleged constitutional violations—newly-discovered scientific evidence related to internal neck hemorrhages in drowning victims

---

[15]    Petitioner argues that this testimony from Morry was limited to the assumption that the water temperature was as cold as thirty-nine degrees. (Doc. No. 14, Pet'r's Reply 7–8.) Morry's testimony on direct was not so clearly limited.

> Q.    . . . . Mr. Morry, Captain Chandler testified that a person who drowns in 40 feet of water goes down and stays down, I think he said minimally for three or four weeks. Is that your experience?
>
> A.    No. Normally bodies coming up is a—there's a wide range to that, from that fact that they don't go down at all to—depending upon the individuality of the situation, the water temperature, the buoyancy of the individual, the kind of clothing that they may have on, the type of food that they may have eaten that creates gasses later on in the putrification process, air in the lungs, so many variables. General rule of thumb, five to—five to eight days you'll usually have them come up, sometimes longer, depending upon—they may be caught into something, and again the temperature of the water would influence that.

(Tr. 1252.)

and the water temperature in Green Lake—"does not satisfy § 2244(b)(2)(B)(ii)'s call for 'clear and convincing evidence' such that 'no reasonable factfinder would have found'" Petitioner guilty of murdering his wife. *Case*, 731 F.3d at 1043. Accordingly, Petitioner "has failed to pass through the second § 2244 gateway, which would allow [the court] to consider the merits of his application." *Id.*

### C.    Actual Innocence Claim

In addition to arguing that Petitioner cannot satisfy the requirements for obtaining relief on a second or successive petition, Respondent argues that Petitioner's claims are untimely and procedurally defaulted. (Resp't's Mem. 35–39.) Petitioner counters that his claims are not barred because he asserts actual innocence and thus falls into the miscarriage of justice exception articulated in *Schlup v. Delo*, which provides a gateway for courts to consider the merits of procedurally defaulted habeas petitions asserting constitutional violations if those petitions also include compelling showings of actual innocence. 513 U.S. at 326–27.

Under *Schlup*, "procedural default is excused if the facts underlying the petitioner's claim, more likely than not, would have resulted in any reasonable jury being unable to convict the petitioner." *Gage v. Chappell*, 793 F.3d 1159, 1168 (9th Cir. 2015). Section 2244(b)(2)(B)(ii) "provides the same thing but raises the petitioner's burden of proof, requiring clear and convincing evidence of innocence instead of preponderance of the evidence." *Id.* (citing *Schlup*, 513 U.S. at 323–27). In a case, such as this one, that is "governed by § 2244(b)(2)(B)," the exception "did not survive enactment of the AEDPA intact. . . . *Schlup* does not abrogate § 2244(b)(2)(B)." *Gage*, 793 F.3d at 1169. *Schlup*

40

can therefore be used in an initial habeas petition to excuse a procedural default, *see House v. Bell*, 547 U.S. 518, 537–38 (2006), or to bypass AEDPA's one-year limitations period, *see McQuiggin v. Perkins*, 569 U.S. 383, 398–400 (2013),[16] but not, as here, in a second or successive habeas petition.

Even if the actual innocence standard applied to Petitioner's claims, the facts underlying those claims do not establish that it is "more likely than not that no reasonable jury would have found petitioner guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 327. As discussed above, Petitioner's newly-discovered evidence is not inherently exculpatory, and evidence produced at trial corroborated Petitioner's guilt.

### D.  Petitioner is Not Entitled to an Evidentiary Hearing

Petitioner argues that he should be granted an evidentiary hearing pursuant to 28 U.S.C. § 2254(e)(2). (Habeas Pet. 24.) This section provides:

> (2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—
>
>   (A) the claim relies on—
>
>     (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

---

[16]   In *McQuiggin*, the petition at issue was "an untimely first federal habeas petition alleging a gateway actual-innocence claim." 569 U.S. at 396. The Court concluded that "[i]n a case not governed by [§ 2244(b)(2)(B)] . . . the miscarriage of justice exception survived AEDPA's passage intact and unrestricted." *Id.* at 397. "The negative implication is that in a case that *is* governed by § 2244(b)(2)(B), the exception did not survive enactment of the AEDPA intact." *Gage*, 793 F.3d at 1169 (emphasis in original).

> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

Accordingly, § 2254(e)(2) "generally bars evidentiary hearings in federal habeas proceedings initiated by state prisoners," but it "includes an exception for prisoners who present new evidence of their innocence." *McQuiggin*, 569 U.S. at 395. This provision only applies, however, where the habeas petitioner "has failed to develop the factual basis of a claim in State court proceedings." § 2254(e)(2); *see also Schriro v. Landrigan*, 550 U.S. 465, 473 n.1 (2007) (explaining that "AEDPA generally prohibits federal habeas courts from granting evidentiary hearings when applicants have failed to develop the factual bases for their claims in state courts") (citing § 2254(e)(2)). Petitioner was able to develop the factual basis for his claims in state court, where he presented the same evidence presented here in connection with this action, Petitioner's Third Federal Habeas Petition. (*See* Bradford Decl. Exs. 4–13); *see also Rhodes IV*, 875 N.W.2d at 784–86, 789 n.10 (discussing expert testimony and DNR report).

In "cases where an applicant for federal habeas relief is not barred from obtaining an evidentiary hearing by 28 U.S.C. § 2254(e)(2), the decision to grant such a hearing rests in the discretion of the district court." *Schriro*, 550 U.S. at 468. "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations which, if true, would entitle the applicant to federal habeas relief." *Id.* at 474. It therefore follows that

"if the record refutes the applicant's factual allegations or *otherwise precludes habeas relief*, a district court is not required to hold an evidentiary hearing." *Id.* (emphasis added). For the reasons stated above, Petitioner is precluded from obtaining habeas relief because he cannot pass through the second § 2244 gateway. This conclusion is based on the evidence presented at trial and the newly-discovered evidence presented by Petitioner in support of his claims. Therefore, an evidentiary hearing is not required. *See Runningeagle v. Ryan*, 825 F.3d 970, 990 (9th Cir. 2016) ("Where documentary evidence provides a sufficient basis to decide a petition, the court is within its discretion to deny a full hearing.").

### E.    The Court Should Issue a Certificate of Appealability

A § 2254 habeas corpus petitioner cannot appeal an adverse ruling on his petition unless he is granted a Certificate of Appealability. 28 U.S.C. § 2253(c)(1)(A); Fed. R. App. P. 22(b)(1); Rule 11(a), Rules Governing Section 2254 Cases. A Certificate of Appealability should not be granted unless the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). In order to obtain a Certificate of Appealability on a claim that was denied on procedural grounds, the petitioner must demonstrate both that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right, and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). As indicated by the dissent in *Rhodes IV*, jurists of reason could find it debatable that Petitioner cannot meet the demanding standard set forth in § 2244(b)(2)(B)(ii), which requires "clear and convincing

evidence of innocence." *Gage*, 793 F.3d at 1168. Therefore, this Court recommends that a Certificate of Appealability be granted.

## III.    Recommendation

Based on the files, records, and proceedings herein, **IT IS HEREBY**

**RECOMMENDED** that:

1.    Petitioner's Petition for a Writ of Habeas Corpus (Doc. No. 1) be

**DENIED**;

2.    Petitioner's request for a Certificate of Appealability be **GRANTED**; and

3.    Judgment be entered accordingly.

Date: July 6, 2018.                     *s/ Becky R. Thorson*_____
                                        BECKY R. THORSON
                                        United States Magistrate Judge

### NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b)(1), a party may file and serve specific written objections to this Report within **fourteen days**. A party may respond to those objections within **fourteen days** after service thereof. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).